**Honorable Bruce W. DODDS,
Plaintiff–Appellant,**

v.

**AMERICAN BROADCASTING COMPANY, INC., a Delaware Corporation, Defendant–Appellee.**

No. 96–56300.

United States Court of Appeals,
Ninth Circuit.

Argued Oct. 9, 1997.

Decided May 27, 1998.

A. Barry Capello, Santa Barbara, CA, for plaintiff-appellant.

Steven M. Perry, Los Angeles, CA, for defendant-appellee.

Before: REINHARDT and TASHIMA, Circuit Judges, and FITZGERALD, Senior District Judge.*

REINHARDT, *Circuit Judge:*

It has been said by supporters of the Honorable Bruce Dodds, a California state court judge, that he is "tough," "short," "abrupt," "direct," "rude," "impatient," and "gruff." *Dodds v. Commission on Judicial Performance,* 12 Cal.4th 163, 48 Cal.Rptr.2d 106, 906 P.2d 1260, 1265 (1995). It has been said by others less sympathetic to his cause that he uses a crystal ball in deciding cases and that he is "anything but a respectable superior court judge." Perhaps understandably, the latter remarks, broadcast nationwide on a news magazine program by the American Broadcasting Company ("ABC"), were the source of considerable consternation to Judge Dodds. In an effort to clear his name and unsully his reputation, he brought a defamation action against ABC, alleging that the network acted with actual malice in broadcasting numerous comments regarding his performance as a judge. He asserted that ABC's broadcast portrayed him as a criminal and as someone who is unfit for judicial service. We consider in this appeal whether the district court properly granted summary judgment in favor of ABC as to the crystal ball comment and whether it properly dismissed the remainder of the claims Judge Dodds now appeals.

## BACKGROUND

While Judge Bruce Dodds was being investigated by the California Commission on Judicial Performance ("the Commission") on allegations of judicial misconduct, the ABC news magazine program "Prime Time Live" profiled him and two other judges in a segment entitled "Who's Judging the Judges." The program was broadcast on television stations across the country in October 1994. According to one of the show's producers, the purpose of the segment was to examine critically the disciplinary processes for judges who have been accused of misconduct, using three individual judges as examples. Although it purported to focus on the disciplinary process, much of the segment was devoted to detailing the misconduct itself.

The basic format of this type of show is familiar to most TV viewers: a news reporter interviews various people about a certain topic, and then combines clips of interviews and narration in order to construct a newsworthy report. Usually there are several segments in each program. In the program at issue, ABC news anchor Diane Sawyer introduced the segment that gave rise to this case by explaining that fellow ABC news reporter Cynthia McFadden was going to report on "judges whose conduct seems downright scandalous." Immediately following this introduction, the segment cut to clips of three individuals commenting on the behavior of unidentified judges; the first individual described a judge, shortly to be revealed as Judge Dodds, as "a court jester ... anything but a respectable superior court judge," while the next two individuals explained that they had been victims of other judges' sexual misconduct. McFadden elaborated on the theme of the show: "Last year, 12,000 complaints were filed against state court judges, yet more than 85 percent of these complaints were dismissed with little or no investigation.... [W]e decided to take a closer look."

McFadden introduced Professor Geoffrey Hazard, a highly regarded expert in the area of legal ethics, explaining that the professor "says there's a troubling tension between having an independent judiciary and reviewing the judges' behavior." Professor Hazard then stated: "The problem of who judges the judges is, particularly in a democracy, perhaps as difficult a question as there can be." McFadden noted that many complaints against judges are frivolous, and that "[t]he trick is to identify the serious ones." The segment then featured stories on three different judges from different parts of the country.

The segment first told the story of a judge in Indiana who had been accused of sexually molesting juveniles and was awaiting trial on

---

* The Honorable James M. Fitzgerald, Senior United States District Judge for the District of Alaska, sitting by designation.

other criminal charges. In that report, a young man explained how he had met the judge when he was in court as a juvenile offender and how the judge had taken an interest in him. Approximately two years later, the youth said, the judge began demanding sex from him. McFadden reported that although the judge had also been accused of similar conduct with other young men who had been in the juvenile justice system, nothing happened until the youth featured on the program helped police arrange a sting operation. She stated that at the time of the broadcast, the judge was facing trial on charges of solicitation of a prostitute and drug dealing.

Following this story, which concluded with shots of the judge being led off in handcuffs, the segment turned to Judge Dodds. McFadden introduced the story by asserting:

In the past four years, I've covered about 250 trials, most of them gavel to gavel. I've often been struck by the way that judges justify their decisions on thorny points, often with wisdom drawn from experience, or with a superior grasp of the law. But never the way a judge in California has been accused of.

This portion of the segment cut first to a newsclip of Dodds denying any wrongdoing. Then McFadden explained that "[f]or the past several years, a stream of complaints" had been lodged against Judge Dodds concerning his lack of "judicial temperament." The segment then featured clips of interviews with people who had dealt with Judge Dodds and reports by McFadden regarding the allegations of misconduct against the judge. McFadden stated, for example, that a former court clerk had declared in a sworn statement that Judge Dodds would read newspapers and magazines while he was on the bench, and that he had screamed and spit in court.

Two litigants who had appeared in Judge Dodds's courtroom also recounted their negative experiences. Cindy Hart, whose divorce case was heard by the judge, stated that he had acted disrespectfully towards her and that when she took the witness stand to testify, he had said: "All I have to do is look at her to see she has psychological problems."

The report then focused on another litigant, Christine Johnson, who had appeared in front of Judge Dodds during the preceding year. Johnson and her son had sued the Catholic church, alleging that a priest had sexually molested the son. She described how the judge belittled their claim during a settlement conference and how he told her that because there were only two incidents of sexual molestation, it was "no big deal, and juries don't like to hear about things that aren't very juicy." McFadden then explained how Judge Dodds had pressured Johnson into accepting a low settlement offer: According to Johnson, Judge Dodds kept a crystal ball on the conference table in his chambers, where the parties engaged in settlement negotiations. After telling her what he thought her case was worth, Judge Dodds pressed a button on the crystal ball. The crystal ball responded "yes," confirming Dodds' settlement figure, and the judge then said to Johnson "There it is. That's it. That's what you get." McFadden stated that "[l]awyers, litigants, and [Dodds's] former clerk all say Dodds often used the crystal ball to support his decisions."

McFadden unsuccessfully attempted to interview Judge Dodds about the allegations and the segment included footage of the judge refusing to talk with her. Following this clip, McFadden explained that Judge Dodds had refused the interview because "state law prevented him from talking about the case." She then stated that ABC personnel had actually seen the crystal ball on a table in Judge Dodds's chambers. In conclusion, McFadden noted that the commission investigating Judge Dodds, later referred to by Sawyer as "the secret commission," did not call as witnesses any of the women who had been interviewed by ABC.

Immediately following the report on Judge Dodds, the segment turned to a story on a South Carolina magistrate who had sexually molested litigants for years. All told, 20 women came forward with complaints about the magistrate's abusive behavior. The magistrate was eventually arrested and charged with multiple counts of assault and battery

and official misconduct. He pleaded no contest to all the charges, but was only sentenced to 400 hours of community service and a $500 fine, despite the fact that he could have been sentenced to a 35-year term of imprisonment and a fine of $35,000. One of his victims expressed her outrage at the punishment, quipping that "[t]he penalty for molesting an alligator in this state is higher than the penalty that [the magistrate] got for molesting a woman."

McFadden ended her part of the program with the following:

Experts say whether judges get away with abusing their public office depends on three factors—how vigorously complaints are investigated, whether secrecy is used to protect judges from serious charges and whether the political climate is such that judges are punished fairly.

Diane Sawyer then offered two final notes. With respect to the Dodds part of the story, she first stated that the judge denied all the allegations against him; second, she stated that the Commission would neither confirm nor deny that an investigation of Judge Dodds was underway.[1] Sawyer concluded the segment by reporting that a number of civil actions had been instituted in South Carolina against the sexually abusive magistrate and that the FBI had commenced an investigation.

Immediately after the program aired, Judge Dodds sought a retraction from ABC. ABC refused and Dodds brought suit against the network for slander and intentional infliction of emotional distress. In his complaint, he alleged that approximately 13 direct or implied statements made during the broadcast were slanderous and false and that ABC had depicted him as a criminal and unfit for office. The complaint further alleged that ABC was negligent and reckless because it broadcast the statements without regard for their truth or falsehood. ABC moved to dismiss the complaint pursuant to Fed. R.Civ.P. 12(b)(6). After a hearing, the district court granted the motion in part and denied it in part, dismissing as not actionable ten of the allegedly defamatory statements. In doing so, the district court narrowed the statements Judge Dodds had complained of down to the following three: (1) the statement that Dodds uses a crystal ball to support his decisions; (2) the statement that he consistently reads newspapers and magazines while he is on the bench; and (3) the statement that he screamed, yelled, and spit in the courtroom.

Subsequently, after additional discovery and depositions, ABC moved for summary judgment on the claims regarding the three remaining statements. Judge Dodds op-

1. The Commission eventually found that Judge Dodds had engaged in misconduct and recommended that he be censured publicly. *Dodds*, 48 Cal.Rptr.2d 106, 906 P.2d at 1260. As the California Supreme Court reported:

[t]he bases for the Commission's recommendation [were] (1) that [Dodds] obstructed a law enforcement investigation, (2) that [Dodds] "has frequently given the appearance of rudeness and prejudgment in his handling of cases," and (3) that [Dodds] made an offensive remark in chambers about two lawyers who had appeared before him.

*Id.* 906 P.2d at 1263.

With respect to the obstruction of justice charge, which related to an incident in which Judge Dodds witnessed another judge letting the air out of a tire on a car parked in the other judge's parking space, the California Supreme Court determined that although Dodds's conduct was "unjudicial and prejudicial," it did not constitute wilful misconduct. *Id.* at 1269. With respect to the in-chambers offensive remark about two lawyers, the court dismissed the

charge on the ground that the California Constitution precluded discipline for offenses occurring "'more than 6 years prior to the commencement of the judge's current term.'" *Id.* at 1270 (quoting Cal. Const. art VI, § 18(c)). The California Supreme Court agreed, however, with the Commission's finding that Judge Dodds's "rudeness and prejudgment in the handling of cases, as exhibited on four occasions, constituted prejudicial conduct," *id.* at 1269, and that it brought "disrepute on the judicial office." *Id.* at 1270. The court then noted that "[t]he record in this case is replete with evidence that [Dodds] is a talented judge who is often sought for his ability to settle difficult cases." *Id.* at 1271. It then concluded by saying "'[t]he purpose of these proceedings is not to punish errant judges but to protect the judicial system and those subject to the awesome power that judges wield.' We conclude that public censure in this case would not further this purpose." *Id.* (citations omitted) (quoting *Furey v. Commission on Judicial Performance*, 43 Cal.3d 1297, 240 Cal.Rptr. 859, 743 P.2d 919 (1987)). It therefore vacated the punishment.

posed ABC's motion only with respect to the statement that he used a crystal ball, which as the district court explained, boiled down to an argument that ABC, "by *stating* that he uses a crystal ball to *support* his decisions ... *impl[ied]* that he only *makes* decisions based on a crystal ball." Because the district court found that Dodds had failed to produce sufficient evidence to support a finding that ABC acted with actual malice, it granted ABC's motion for summary judgment.

Judge Dodds appeals the district court's grant of summary judgment as to the crystal ball claim, as well as the district court's dismissal of seven of the ten dismissed claims. He does not challenge the grant of summary judgment as to the statements that he read the newspaper and magazines on the bench and that he screamed, yelled, and spit in the courtroom; nor does he appeal the dismissal of three of the claims the district court dismissed.

## DISCUSSION

Judges provide an easy and attractive target for unwarranted verbal assaults by all kinds of people, some of whom are simply frustrated by life or desirous of shifting the blame for their own failures to others, and some of whom find it to their personal advantage for one reason or another to criticize the judiciary or the judicial system. Judges are assaulted verbally by litigants, lawyers, state and federal public officials, the media, and even their superiors on the bench. The attacks range from the political (such as attacks on "activist" judges) to the highly personal, *see, e.g., Standing Committee v. Yagman*, 55 F.3d 1430, 1433–35, 1434 n. 4 (9th Cir.1995), from the bizarre to the outrageous. Sprinkled among these assaults, however, are legitimate expressions of criticism that constitute an essential part of the examination of the workings of an important government institution—an institution that must remain fully open to public scrutiny.

Wise judges, even when wounded by unfair assaults, have learned that the best policy is ordinarily to dismiss the attacks as part of the baggage of their jobs. Abusive criticism simply goes with the territory. Often it is best not to dignify the assaults or to fall into the traps set by one's critics. *See United States v. Flynt*, 756 F.2d 1352 (9th Cir.1985). Thin-skinned judges sometimes make the problem worse by seeking retribution for the insults, instead of maintaining the dignity their office demands.

That is not to say that the bench is helpless or that the bar should not speak forcefully in defense of the bench when judges are unjustly maligned. Doing so is indeed an important part of the bar's responsibility. It is all too often the case, however, that when the judge himself enters the fray as an active combatant what was already an unfortunate episode tends to become an ugly and demeaning public spectacle. *Id.* Similarly, judges must remain conscious of the bar's right of free speech, which may involve expressions that are distasteful, if not reprehensible. *See Yagman*, 55 F.3d at 1444–45.

Nevertheless, judges, like all other persons, have rights and may choose to answer or litigate when they believe that they have been wronged. Among their options is the filing of an action for defamation, as Judge Dodds did here. However, as we have already indicated, along with the advantages of public office come some limitations on the rights enjoyed by the average citizen.

It is well established that the First Amendment provides broad protection for journalistic expression that is critical of the conduct of public officials, including judges. One protection is that because Dodds is a public figure, ABC's broadcast concerning his alleged judicial misconduct will expose the network to liability under state defamation laws only if ABC acted with "actual malice." *See New York Times v. Sullivan*, 376 U.S. 254, 280, 279–80, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). This high standard of proof shields journalists who expose misconduct by public officials from liability and thereby guards against the chilling effect that state defamation laws may have on the free flow of information with respect to matters of public concern. *Id.* at 279, 84 S.Ct. 710. Another important protection is that the media and the public are free to express their opinions regarding the fitness or qualifications of public officials, including judges,

to hold office, as long as in doing so they do not make statements of fact that are otherwise actionable. *See Monitor Patriot Co. v. Roy,* 401 U.S. 265, 91 S.Ct. 621, 28 L.Ed.2d 35 (1971). The right to express such opinions lies at the heart of the democratic process, and it is, indeed, an oft-exercised form of free speech.

## I. SUMMARY JUDGMENT

 In order to survive ABC's motion for summary judgment, Dodds must establish that a reasonable jury could find by clear and convincing evidence that ABC published the challenged statements with knowledge of their falsity or with reckless disregard for their truth or falsity. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255–56, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *see also Masson v. New Yorker Magazine, Inc.,* 501 U.S. 496, 511, 111 S.Ct. 2419, 115 L.Ed.2d 447 (1991). With respect to "reckless disregard," Judge Dodds must demonstrate that a genuine issue of fact exists with respect to whether ABC subjectively doubted the veracity of the statements. *Bose Corp. v. Consumers Union,* 466 U.S. 485, 513, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984). Our assessment regarding whether summary judgment is proper is influenced by the burden of proof Dodds would bear at trial. *Anderson,* 477 U.S. at 254, 252–54, 106 S.Ct. 2505 ("When determining if a genuine factual issue as to actual malice exists in a libel suit brought by a public figure, a trial judge must bear in mind the actual quantum and quality of proof necessary to support liability under *New York Times.*").

We agree with the district court that Judge Dodds did not meet his burden and that ABC was therefore entitled to summary judgment. Dodds failed to establish that a jury could reasonably find by clear and convincing evidence that ABC acted with actual malice with respect to the statement that he often uses a crystal ball.

### The Crystal Ball

Judge Dodds's opposition to the district court's award of summary judgment is based on his objection to ABC's assertion that he used a crystal ball in the decision-making process. Dodds maintains that two distinct defamatory statements arose from the broadcast: (1) that he often used the crystal ball to *support* his judicial decisions, and (2) that he regularly used the crystal ball to *make* his judicial decisions, either of which could form a basis for his defamation claim.[2]

The first direct reference to the crystal ball was uttered in the segment's introduction by Cindy Hart, an interviewee who had been a litigant in Judge Dodds's courtroom. Hart declared that "[h]e uses a crystal ball often, even in adoption cases." Although Judge Dodds was not specifically identified as such, he was clearly the subject of Hart's statement. The second direct statement was made during Judge Dodds's part of the segment by another former litigant, Christine Johnson, who told ABC during an interview that the judge "had a crystal ball on the settlement conference table where he asked us to sit." Johnson, who was suing the Catholic Church on behalf of her son, then described her experience with Judge Dodds and his use of the crystal ball to support the settlement figure he proposed. Finally, in a third direct statement about the crystal ball, McFadden asserted: "Lawyers, litigants and his former clerk all say Dodds often used the crystal ball to support his decisions." There was, of course, also the indirect reference in McFadden's introduction of the part of the segment relating to Judge Dodds.

Judge Dodds challenges McFadden's direct statement that he often used the crystal ball to support his decisions, as well as the statement he argues is implied in the direct statement of Hart that he regularly used the crystal ball to make his decisions.[3]

---

2. For purposes of this opinion, we assume that the statements would be defamatory under California state law, that is that they are demonstrably false and that they caused damage to Dodds's reputation.

3. If the only crystal-ball related statement at issue in this case were Johnson's, Dodds's admission during his deposition that he recalled using the ball during her settlement conference (but only for levity) would be dispositive of this claim because he would have failed to establish the falsity of the statement. However, Dodds alleges

As we noted above, Judge Dodds could prevail by showing either that ABC knowingly published false statements or that ABC acted with reckless disregard for the truth— that is, by showing that ABC had " 'obvious reasons to doubt the veracity' of its reporting, but engaged in 'purposeful avoidance of the truth.' " *Eastwood v. National Enquirer, Inc.*, 123 F.3d 1249 (9th Cir.1997) (quoting *St. Amant v. Thompson*, 390 U.S. 727, 732, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968), and *Harte–Hanks Communications, Inc. v. Connaughton*, 491 U.S. 657, 109 S.Ct. 2678, 105 L.Ed.2d 562 (1989)). We are guided in our analysis by the Supreme Court's reasoning in *Harte–Hanks*, which elaborated on the high standard of proof required to show that a defendant acted with reckless disregard.

> A "reckless disregard" for the truth ... requires more than a departure from reasonably prudent conduct. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication. The standard is a subjective one— there must be sufficient evidence to permit the conclusion that the defendant actually had a high degree of awareness of probable falsity. As a result, failure to investigate before publishing, even when a reasonably prudent person would have done so, is not sufficient to establish reckless disregard. In a case such as this involving the reporting of a third party's allegations, recklessness may be found where there are *obvious reasons to doubt the veracity of the informant or the accuracy of his reports.*

*Id.* at 688, 109 S.Ct. 2678 (internal quotations and citations omitted) (emphasis added).

In light of this standard, we discuss Judge Dodds's claim with respect both to the direct statement that he uses the crystal ball to support his decision and the implied statement that he uses the crystal ball to make his decisions, beginning with the former.

that ABC's broadcast of the other material effectively implied that he *often* used the crystal ball, an assertion he denies. We believe that a reasonable juror could conclude that the statements carry the implication that Dodds regularly used a crystal ball to support his decisions.

### A.

■ In support of his claim based on McFadden's assertion that he often used a crystal ball to support his decisions, Judge Dodds contends that there was sufficient evidence from which a reasonable juror could find that ABC had actual knowledge as to the falsity of this statement. He relies principally on a common-sense argument: ABC was aware that the crystal ball was a toy and "this fact plainly suggested that the crystal ball toy would not be used as support for any judicial decision," particularly in view of the fact that the ball responded in the negative half of the time. Judge Dodds also points out that McFadden admitted in her deposition that she thought it possible that he was using the crystal ball for "levity." In essence, he argues that no one could honestly believe that a sitting judge would use a toy in the context of serious judicial proceedings.[4] He concludes by saying that ABC must have known that he did not use the crystal ball to support his decisions and consequently must have known that its statement to that effect was false.

For several reasons, we are not persuaded by this argument. Significantly, we note that numerous sources informed ABC that they were personally aware of Judge Dodds's use of the crystal ball in the manner suggested by the litigants who actually appeared in the broadcast. These additional sources included other litigants, a former clerk, and attorneys who had dealings with Judge Dodds. In addition, although its methods of obtaining the information left something to be desired, ABC confirmed that a crystal ball sat on Judge Dodds's table in chambers; one of the show's producers took advantage of an open door to the chambers and forced his way inside where it sat in plain view. The fact that the crystal ball was obviously a toy is of little consequence. People, even judges, do peculiar things and engage in bizarre

4. We note that the persuasiveness of this argument is significantly undercut by Dodds's own admission during his deposition that he had in fact used the crystal ball during the settlement negotiations involving Johnson.

conduct. That, in fact, was precisely ABC's point about Judge Dodds. Moreover, it would have been just as (if not more) absurd and unbelievable if ABC's investigation indicated that Dodds had been using a "real" crystal ball to support his decisions.

■ Alternatively, Judge Dodds asserts that ABC's sources were unreliable and that its investigation was shoddy. From this evidence, he argues, a reasonable jury could conclude that ABC acted with reckless disregard for the truth. To prevail under this theory, Dodds must show that ABC had " 'obvious reasons to doubt the veracity' of its reporting," but deliberately avoided learning the truth. *Eastwood*, 123 F.3d at 1251 (quoting *St. Amant*, 390 U.S. at 732, 88 S.Ct. 1323). Toward this end, he contends that in addition to the fact that the crystal ball was a toy, there were other obvious reasons for ABC to question the truth of its reporting. In particular, he asserts that ABC's sources were patently unreliable, in spite of which the network failed to conduct a more extensive investigation.

With respect to ABC's sources, Judge Dodds first contends that Christine Johnson was not trustworthy. In particular, he maintains that ABC should have been suspicious of Johnson's statements on account of her deep religious convictions. However, although her religious beliefs may have had some effect on her view toward the use of a crystal ball, toy or not, they were not an indication that she was in any way unreliable or that she did not truthfully report the details of the incident to ABC. In any event, even if the network had had cause to doubt her story, the fact that the information she provided to ABC was consistent with the information ABC obtained from its other sources would have been sufficient to dispel whatever doubts might have existed. ABC additionally contacted the attorneys who had represented Johnson in her lawsuit to confirm with them her recollection of the settlement conference. Furthermore, ABC knew that Johnson had made identical allegations regarding the crystal ball in a letter of complaint that she had submitted to the California Commission on Judicial Performance immediately after the incident.

Judge Dodds also challenges the trustworthiness of Cindy Hart, another former litigant, arguing that she was biased against him because she was unhappy with the results of her divorce. It is true that Hart was angry about how she had been treated in the course of her proceedings before Judge Dodds. It is also true that her statement that Judge Dodds used the crystal ball even in adoption cases was not based on first-hand knowledge, but was instead based on her own research into Dodds's judicial activities. ABC did not, however, simply rely on unverified statements made by a disgruntled litigant. Other sources confirmed the existence of the crystal ball and Hart's statements concerning Judge Dodd's use of the crystal ball in the context of adoption cases were corroborated by at least one other source, an adoption caseworker.

According to Judge Dodds, the former court clerk was also unreliable because in a sworn declaration regarding her observations of Dodds's courtroom behavior, she omitted any mention of the crystal ball. Dodds maintains that "one would expect her to allege Judge Dodds' most serious judicial defects [but she] said nothing about a crystal ball." Yet considering the context in which she made the declaration—it was apparently submitted in connection with Cindy Hart's ongoing divorce litigation, as evidence of Dodds's ill temper—it does not seem all that unusual that the former clerk would leave the crystal ball stories out. The ABC producer who researched the report interviewed the former clerk in person and found her to be credible. Moreover, ABC had no reason to doubt that the clerk was telling the truth.

Judge Dodds nonetheless asserts that ABC failed to pursue other avenues of information, in reckless disregard of its obligations. For example, he faults McFadden for not contacting the local bar association or interviewing other judges. He also asserts that McFadden should have inquired into whether the crystal ball was real or a toy, arguing that if she had discovered it was a toy and that it did not always respond favorably, she would have learned that he did not actually use the ball to justify his decisions. In addition, McFadden admitted at her depo-

sition that she was not as concerned about the underlying truth of the interviewees' statements as she was about how complaints against judges were processed.

Notwithstanding Judge Dodds's assertions to the contrary, we conclude that any failures or omissions in ABC's conduct with respect to the reliability of its sources fall far short of that required to establish that it acted with reckless disregard for the truth. In *St. Amant,* 390 U.S. at 732–33, 88 S.Ct. 1323, for example, the Supreme Court held that a journalist does not act with reckless disregard for the truth when he relies on a source whose trustworthiness is unknown, so long as the journalist makes at least some attempt to verify the source's story. Other than fairly vague and routine reasons to question their motives, however, ABC had no particular cause to doubt the veracity of the people whom it interviewed. There is nothing in the record to suggest that Johnson, Hart, and the former clerk were prone to exaggeration or lying or would deliberately engage in such conduct.

Wholly aside from the question of the crystal ball, Judge Dodds is correct that ABC could have done a more thorough and responsible job in general in determining the facts before presenting its report regarding him. That, however, is not the test for determining whether the network acted with actual malice in the context of defamation of a public figure. Moreover, we note that ABC probably would have satisfied its burden even if it had initially had reasons to doubt the veracity of its informants. It did not engage in purposeful avoidance of the truth, but rather sought out the best possible source to refute the allegations, either by providing direct evidence or supplying the names of persons who could do so. That source was Judge Dodds. Dodds, however, refused to answer the investigator's questions or to furnish any information at all, as was his prerogative.

■ In sum, Judge Dodds has succeeded, at most, in raising a factual issue regarding whether ABC was negligent in failing to conduct a more rigorous investigation of its story in general and its sources in particular. Mere negligence, however, is insufficient to demonstrate actual malice. *Masson,* 501 U.S. at 510, 111 S.Ct. 2419. McFadden's admitted lack of concern regarding the truth of the statements would only satisfy the requirements of *New York Times* if she had a *"high degree of awareness"* that the statements were probably false. *Harte–Hanks,* 491 U.S. at 688, 109 S.Ct. 2678. Dodds failed to present any evidence that such was the case, and in any event, whatever McFadden's own lack of concern may have been, ABC satisfied any obligation it may have had by checking the information it received with a number of knowledgeable individuals and by providing Judge Dodds with the opportunity to refute the charges and supply any useful evidence he may have possessed, including the names of any favorable witnesses.[5]

**B.**

■ Having concluded that ABC did not act with reckless disregard in broadcasting the statements regarding Judge Dodds's use of the crystal ball to *support* his decisions, we next consider whether a factually incorrect (and defamatory) implication arose from these statements; namely that Judge Dodds used the crystal ball to *make* his decisions. If so, we must examine whether ABC can be held liable for such an implied statement. In order to prevail on his claim that ABC's direct statements *impliedly* defamed him by indirectly stating that he used the ball to make his decisions, Judge Dodds must show that the words ABC uttered were reasonably capable of sustaining that meaning. More important, he must show that a jury could reasonably find by clear and convincing evidence that ABC "intended to convey the

---

5. The parties have not briefed the question whether, as Dodds apparently contended, state law precludes judges from commenting on allegations of misconduct or even responding publicly to public charges when some or all of the allegations are being investigated by the Commission. Accordingly, we will not undertake to evaluate the correctness of this assertion. We note, however, that at the end of the segment Diane Sawyer stated that Judge Dodds had denied all of the allegations, and also that the segment contained a newsclip of his earlier denial of them.

defamatory impression." *Newton v. National Broadcasting Co., Inc.,* 930 F.2d 662, 681 (9th Cir.1990).

 As to the first requirement, it may well be that when the segment is viewed in its entirety, the implication Judge Dodds suggests can readily be drawn from the totality of the crystal-ball-related statements. The first reference to the crystal ball was Hart's general assertion that Judge Dodds "often uses" the crystal ball. Hart did not specify that the judge uses it only to support his decisions. And, as Judge Dodds points out, the visual accompanying the third statement (McFadden's statement that "[l]awyers, litigants and his former clerk all say Dodds often used the crystal ball to support his decisions") showed Dodds on the bench where, presumably, he was deciding cases. Given the context of the piece, which focused on "outrageous judicial behavior," and given McFadden's assertion in her introduction of Judge Dodds's story that she had witnessed hundreds of trials and had "often been struck by the way that judges justify their decisions on thorny points .... but never the way [Dodds] ha[d] been accused of," a reasonable juror could find that ABC was stating by implication that Judge Dodds in fact decided issues by consulting the crystal ball.

 It is not enough, however, to show that this implication was reasonable. Judge Dodds must further establish that ABC intended to convey the defamatory implication—and he must do so with "convincing clarity." *Newton,* 930 F.2d at 682. His strongest argument in this respect is that during the production process, ABC had slated him in a category entitled "how judges decide." But this evidence is wholly undercut by the undisputed facts. The category was proposed, and the report on Judge Dodds initially slated for it, well before ABC began conducting its interviews about him; however, after ABC completed those interviews it decided not to use any such category in the finished program. We do not think a reasonable juror could find that ABC's initial contemplation of a plan that it subsequently abandoned supports a conclusion that it intended to make the defamatory implication in the show that it actually produced. There is,

in short, simply no evidence that the show's producers intended in the actual broadcast to convey to viewers the impression that Judge Dodds used the crystal ball to make his decisions. Nor does the segment itself contain any language demonstrating that ABC endorses any such defamatory implication.

Judge Dodds asks us to reconsider *Newton*'s requirement that the test is a subjective one—that the network must have actually intended to convey the defamatory impression—and urges us to adopt in its place an objective, "reasonable viewer" standard. Under such a standard, a media defendant would be liable so long as the ordinary viewer would have perceived the implication, irrespective of the defendant's actual intent to convey the defamatory statement.

Recently, however, we reaffirmed our rule that subjective or actual intent is required and that "there is no actual malice where journalists unknowingly mislead the public." *Eastwood,* 123 F.3d at 1256. Moreover, all the courts of appeal that have considered cases involving defamation by implication have imposed a similar actual intent requirement. *See, e.g., Chapin v. Knight–Ridder,* 993 F.2d 1087, 1093 (4th Cir.1993) ("The language must not only be reasonably read to impart the false innuendo, but it must also affirmatively suggest that the author intends or endorses the inference."); *White v. Fraternal Order of Police,* 909 F.2d 512, 520 (D.C.Cir.1990) ("[I]f the communication, by the particular manner or language in which the true facts are conveyed, supplies additional, affirmative evidence suggesting that the defendant *intends* or *endorses* the defamatory inference, the communication will be deemed capable of bearing that meaning.") (emphasis in original); *see also Partington v. Bugliosi,* 56 F.3d 1147, 1152 n. 9 (9th Cir. 1995) (discussing *Chapin* and *White* ). Furthermore, we continue to believe that the *Newton* test requiring a clear and convincing showing of subjective or actual intent strikes the proper balance between protecting victims of defamation and protecting against the possible chilling effect that results from overly broad applications of our defamation laws.

## II. DISMISSED CLAIMS

Judge Dodds also asserts that the district court erred in dismissing seven of his original 13 claims pursuant to Fed.R.Civ.P. 12(b)(6). The statements in question were not direct assertions of fact, but rather were, according to Dodds, implied either by a part of or the entirety of the show. The statements Judge Dodds contends ABC "made" were as follows:

(1) his conduct was the same as that of an accused or convicted felon;

(2) he is one of the three worst judges in the country;

(3) he has participated in a secret cover-up of his improprieties;

(4) he constantly pressures parties to settle cases for less than they are worth;

(5) he is hiding from public view;

(6) he is eluding discipline because serious allegations are not vigorously investigated, secrecy is used to protect him from serious charges, and the political climate protects him; and

(7) he is "unfit" to serve as a judge.

ABC asserts that it never made the defamatory statements—in other words, that what it reported in the segment cannot reasonably be understood to convey the alleged defamatory implications. Alternatively, it argues that even if the statements it made could reasonably be so understood, they are not actionable because they constitute opinions regarding Judge Dodds's performance as a judge rather than assertions of fact susceptible of being proven true or false.

█ In *Milkovich v. Lorain Journal Co.,* 497 U.S. 1, 20, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990), the Supreme Court canvassed its cases concerning the relationship between the First Amendment and state defamation laws. While the Court refused to create a strict dichotomy between opinion and fact, as the defendants had urged, it recognized that there can be no liability for defamation if a defendant's direct statement " 'cannot reasonably be interpreted as stating actual facts' about an individual" that are provably false. *Id.* at 20, 110 S.Ct. 2695 (quoting *Hustler Magazine v. Falwell,* 485 U.S. 46, 50, 108 S.Ct. 876, 99 L.Ed.2d 41 (1988)). Under

*Milkovich,* therefore, Judge Dodds must show that a reasonable juror could conclude that the allegedly defamatory implications constituted provably false assertions of fact.

Accordingly, because Judge Dodds's claims are based on statements he alleges are implied in the broadcast, he faces three obstacles to establishing liability, in addition to having to show that the statements are defamatory. Two of the obstacles—establishing that a reasonable juror could find that the broadcast either directly or impliedly made the statements, and establishing that the statements are factual in nature and susceptible of being proved true or false—present insuperable problems for Dodds at the motion to dismiss stage. As we discussed above, the third obstacle—establishing actual malice—serves to defeat the crystal ball claim (as well as two others not appealed) at the summary judgment stage. After carefully reviewing the claims that were dismissed, and are now appealed, we agree with the district court that the statements upon which they were based are not actionable, either because they are not implications the segment reasonably can be understood to convey or because they are not assertions of fact and thus cannot be proved to be false.

### A. Dodds's conduct is the same as that of a felon.

█ ABC made no explicit statement asserting that Judge Dodds had engaged in conduct that was equivalent to the actions of a felon, but he contends that the network intended to convey this message. He relies principally on the fact that the segment sandwiched his story in between stories on two other judges each of whom was accused of serious felonious activities. In particular, he asserts that "the broadcast could have been seen by a reasonable viewer as saying that [he] was liable for conduct not even discussed" and that the broadcast "left the impression that [he] had committed undisclosed felonies." We disagree.

Judge Dodds relies on *Weller v. American Broadcasting Companies, Inc.,* 232 Cal. App.3d 991, 283 Cal.Rptr. 644 (1991), in support of his contention that ABC implied that

he had engaged in criminal activities. The broadcasts at issue in *Weller*, however, were of an entirely different character. The plaintiff in that case had been the subject of an investigation by the ABC affiliate station in San Francisco. Over the course of several weeks, the station broadcast numerous pieces regarding the plaintiff's role in an allegedly fraudulent sale of two antique candelabra to a local museum. In those broadcasts, the reporter linked the plaintiff to a convicted felon and clearly suggested that the plaintiff had played a role in the fraud.

Here, however, ABC made no suggestion that Judge Dodds was connected to any criminals or to any criminal activity. Although ABC's decision to include his story in the same segment with stories about two other judges whose actual or alleged conduct was criminal may well have been irresponsible, and unfair to Judge Dodds, we agree with the district court that the implication cannot reasonably be drawn that Judge Dodds was involved in any criminal activity.

### B. Dodds is one of the three worst judges in the country.

■ Judge Dodds maintains that by focusing its story on him and two other judges, ABC intended to convey to its viewers that it had selected the three worst judges in the country to profile. While we think it could reasonably be inferred that Judge Dodds's conduct was among the most disturbing that ABC had uncovered, we do not believe it is a reasonable inference that the three judges featured in the segment were *the three worst* in the country. A reasonable viewer would not have understood that ABC, by selecting three judges to profile, was making a statement to that effect. Moreover, even if ABC had made such a statement, it would be in the nature of an opinion rather than the type of factual assertion that can be proved to be demonstrably false.

### C. Dodds participated in a cover-up.

■ In the portion of the segment profiling Judge Dodds, ABC included shots of a closed door accompanied by McFadden's discussion of the Commission's investigation of the judge. McFadden stated that several people who had formally complained about Judge Dodds's behavior were not asked to testify before the Commission. He argues that a reasonable implication of this is that he was participating in a cover-up of his activities. We do not believe that a reasonable factfinder could conclude that ABC's statements conveyed any such implication. Although the inference might reasonably be drawn that the Commission was acting in secrecy, perhaps improperly, there was no implication that Dodds himself was a participant in any cover-up. Therefore, the statement was not actionable.

### D. Dodds pressures parties to settle cases for less than they are worth.

■ In connection with Christine Johnson's statements that Judge Dodds pressured her into settling her case against the Catholic Church for far less than what it was worth, Judge Dodds asserts that ABC implicitly stated that he "wrongfully and constantly pressures cases to settle for less than they are worth." Part of this statement—that he pressures parties to settle their cases—is not defamatory. In fact, Judge Dodds is sought after because of his settlement skills. *See Dodds*, 48 Cal.Rptr.2d 106, 906 P.2d at 1270. Exerting pressure on parties is part of the settlement process; or at least it is a technique used by many settlers. The allegation that Judge Dodds exerts this pressure wrongfully in order to get parties to settle for less than their cases are worth is not actionable. We agree with the district court that the term "wrongful" as used in this context is vague and not susceptible to proof as to its truth or falsity. The "worth" of cases and whether a judge tries to settle cases for less than their worth are largely subjective questions involving difficult and complex legal and practical judgments. Accordingly, that part of the allegation does not constitute an assertion of fact that can be proved false.

### E. Dodds is hiding from public view.

■ Judge Dodds contends that ABC's statement that he refused to comment, coupled with the film clip of him walking away

from McFadden as she attempted to interview him, conveys the implication that he was in hiding from the public. We do not think this factual assertion can reasonably be inferred from the segment. ABC stated that Judge Dodds was prohibited from talking to the media about the pending disciplinary proceedings, and there was no suggestion that his refusal to talk to ABC was the result of his hiding out. Moreover, presenting footage of a public official refusing to answer questions about scandalous charges does not constitute defamation of the official. To the contrary, it is simply a regular part of the nightly news these days.

### F. Dodds is eluding discipline.

█ Judge Dodds asserts that the statement that he is eluding discipline, like the statement that he is participating in a cover up, was implied by means of the closed-door shots and the description of the disciplinary committee as being engaged in a secret investigation. We cannot agree, however, that the segment can reasonably be understood as conveying such an implication. ABC's message in this respect was rather that Judge Dodds may avoid being punished for his errant behavior not because of his own efforts to elude discipline, but because of a faulty disciplinary system. Accordingly, the statement is not actionable.

### G. Dodds is unfit to serve as a judge.

█ ABC did not state that Judge Dodds was unfit to serve as a judge, but Judge Dodds contends that this is a reasonable implication arising from statements that relate to his use of the crystal ball and statements that suggest that his conduct was equivalent to that of an accused or convicted felon. For at least two reasons we hold that the implied statement that Judge Dodds is unfit for judicial office is not actionable. First, according to Judge Dodds, the implication of unfitness arises from one set of comments and one alleged subsidiary implication, both of which we have already considered and disposed of in a manner that precludes him from prevailing on this claim. Given that we have held that the alleged implication that Judge Dodds's conduct was the same as a felon's did not arise and that the set of comments regarding the crystal ball was not made with actual malice, Dodds cannot convert these two nonactionable items into an implied actionable statement by asserting that they compel a defamatory conclusion.[6] As we have previously stated, an opinion based on an implication arising from disclosed facts is not actionable when the disclosed facts themselves are not actionable. *See Partington*, 56 F.3d at 1156 ("[W]hen a speaker outlines the factual basis for his conclusion, his statement is protected by the First Amendment."); *see also Yagman*, 55 F.3d at 1439 ("A statement of opinion based on fully disclosed facts can be punished only if the stated facts are themselves false and misleading."). Thus, even if ABC had ended its story on Judge Dodds by explicitly stating that he was unfit for judicial office, a reasonable viewer would have understood that the network was expressing an opinion it had formed on the basis of the (nonactionable) information it had presented, and the opinion would be protected by the First Amendment.[7] *See Partington*, 56 F.3d at 1156; *see also Yagman*, 55 F.3d at 1439 ("When the facts underlying a statement of opinion are disclosed, readers will understand they are getting the author's interpretation of the facts presented."); *Moldea*, 22 F.3d at 317 (stating that an assertion, even if verifiable,

---

**6.** While the crystal ball claim was not determined to be nonactionable until summary judgment, the dismissal of the "unfitness" claim on a 12(b)(6) motion does not constitute reversible error. In the first place, because the other alleged basis for the implication of unfitness has been found not to support the meaning Dodds attaches to it, it is only the crystal ball claim that could give rise to the alleged defamatory implication. Thus even if the dismissal was premature, it was not prejudicial because we have held that the crystal ball claim is nonactionable. Moreover, the motion to dismiss was in any event

properly granted for the second reason explained in the text *infra*.

**7.** Even were we to consider the other statements that Dodds does not raise on appeal, including the segment in its entirety, we would reach the same conclusion because none of the specific statements was independently actionable and the segment as a whole conveys a message that is too debatable and subjective to meet the *Milkovich* standard.

is not actionable if it is "supported by revealed premises" that are not false). In the case of a public figure, the rule we have described is applicable not only where the underlying facts are not actionable because they are nondefamatory but also where they are not actionable because there is an absence of actual malice.

 Second, and more important, we hold in the alternative that statements of opinion concerning whether a person who holds high public office is fit for that office or is competent to serve in that position are protected under the First Amendment, whether or not those statements are supportable, verifiable, or based on facts or premises that are disclosed. This is particularly true where the subject of the comments holds elective office (as does Judge Dodds) or is a candidate for such office, although the rule clearly applies equally to all state and federal judges, elected, appointed, or otherwise. *See Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 345, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974) (noting that "those classed as public figures have thrust themselves to the forefront of particular public controversies ... they invite attention and comment").

In *Partington*, we held that statements concerning an attorney's performance during a particular trial were protected by the First Amendment. While we expressly reserved the question "whether the First Amendment would protect more general statements regarding a lack of professional ability," 56 F.3d at 1152 n. 7, we hesitated only with respect to statements concerning the general competence of private individuals. *See also id.* at 1158 n. 16. However, a statement that someone who holds high public office, including judicial office, is unfit to serve in that position clearly reflects a subjective opinion regarding an important public policy matter and is part of the ongoing political debate that is protected by the First Amendment. Opinions as to whether an officeholder deserves or is qualified to hold his position are often expressed in hyperbolic and offensive terms. *See Monitor Patriot*, 401 U.S. at 275, 91 S.Ct. 621 (noting that political speech may include " 'exaggeration [and] vilification of men who have been, or are, prominent in

church or state' ") (quoting *Cantwell v. Connecticut*, 310 U.S. 296, 310, 60 S.Ct. 900, 84 L.Ed. 1213 (1940)). Oftimes political statements are neither mature nor enlightening; sometimes they are even erroneous. Nevertheless, such statements constitute the type of speech that "must be protected if the freedoms of expression are to have the 'breathing space' that they 'need to survive.' " *New York Times*, 376 U.S. at 279, 84 S.Ct. 710 (quoting *N.A.A.C.P. v. Button*, 371 U.S. 415, 433, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963)). Part of our American heritage is the right of all citizens to express their views about politicians, officeholders, and umpires, frequently in highly unfavorable terms. Indeed, were we to conclude otherwise, millions of citizens and hundreds of political pundits would currently be committing libelous and slanderous acts on a daily basis.

In concluding that expressions of opinion regarding a public official's "fitness" for the position constitute protected speech, we note that our holding does not change the rule that subsidiary statements that contain false and defamatory factual assertions are actionable, if made with actual malice. Here, however, as we have explained, there are no such subsidiary statements that qualify. The district court properly dismissed the claim that is based on the "implication" that Judge Dodds is not fit for judicial service.

## CONCLUSION

For the reasons stated above, we affirm the district court's order as to the dismissed claims that Judge Dodds appeals. We also affirm its order of summary judgment as to the one claim covered therein.

**AFFIRMED.**