**Judith E. WORRELL–PAYNE, Plaintiff,**

v.

**GANNETT CO., INC., a Delaware corporation, d/b/a The Idaho Statesman, Defendant.**

**No. CIV 98–228–S–FVS.**

United States District Court, D. Idaho.

Nov. 15, 2000.

Donald W. Lojek, Lojek & Strother, Boise, ID, for Judith E. Worrell–Payne, Plaintiff.

Debora K. Kristensen, Givens Pursley, Boise, ID, for Gannet Co., Inc., Defendant.

## ORDER GRANTING SUMMARY JUDGMENT

VAN SICKLE, Chief Judge.

**THIS MATTER** came before the Court without oral argument based upon the de-

fendant's motion for summary judgment. The defendant is represented by Debora K. Kristensen; the plaintiff by Donald W. Lojek.

### BACKGROUND

In 1967 and 1970, respectively, the Legislature of the State of Idaho enacted the "Housing Authorities and Cooperation Law," Idaho Code ("I.C.") §§ 50–1901 to 50–1927, and the "County Housing Authorities and Cooperation Law," I.C. §§ 31–4201 to 31–4226. These two statutes authorize cities and counties to create housing authorities.[1] Whether a housing authority is created by a city or a county, it is governed by five commissioners. Idaho Code §§ 31–4210; 50–1910. They may hire an executive director to administer housing programs. *See id.* At some point, the City of Boise and Ada County created a joint housing authority. Commissioners were appointed. In 1986, they hired Judith E. Worrell–Payne as the executive director.

During the Spring of 1996, *The Idaho Statesman* newspaper ("the *Statesman*") began printing articles that were critical of Mrs. Worrell–Payne's performance as executive director. In an effort to exonerate herself, Mrs. Worrell–Payne addressed her critics' accusations at a meeting of the housing authority's commissioners on May 14, 1996. After the meeting, she answered reporters' questions and provided a packet of documents that helped explain her position. The *Statesman* did not accept Mrs. Worrell–Payne's explanation of its criticism. If anything, its reporting became more biting. The following month, Mrs. Worrell–Payne was fired. Even then, the

---

1. *Compare* I.C. § 31–4205 ("In any county of the state of Idaho, there may be created an independent public body ... to be known as a housing authority[.]") *with* I.C. § 50–1905 ("In any city of the state of Idaho, there may be created an independent public body ... to be known as a housing authority[.]").

criticism did not cease. As recently as April 8, 1998, the *Statesman* printed an article that was critical of Mrs. Worrell–Payne.

In 1998, Mrs. Worrell–Payne filed suit in United States District Court against Gannett Co., Inc. ("Gannett"), the Delaware corporation that does business as *The Idaho Statesman*. She alleges that by printing the articles described above, Gannett committed the torts of defamation (or libel), defamation by implication, invasion of privacy, intentional infliction of emotional distress, intentional interference with contract, and intentional interference with a prospective economic advantage. Gannett moves for summary judgment on essentially two grounds: (1) Mrs. Worrell–Payne cannot prove essential elements of her state-law claims; and (2) the articles of which she complains are protected by the First Amendment. Mrs. Worrell–Payne urges the Court to deny Gannett's motion. In an effort to demonstrate the existence of genuine issues of material fact, she has submitted an affidavit that analyzes numerous newspaper articles.

**STANDARD**

■ Mrs. Worrell–Payne is seeking relief from Gannett under the law of the State of Idaho. In *New York Times Co. v. Sullivan*, 376 U.S. 254, 279, 84 S.Ct. 710, 725–26, 11 L.Ed.2d 686 (1964), the Supreme Court held that the First Amendment, as applied to the states through the Fourteenth Amendment, "prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice'— that is, with knowledge that it was false or with reckless disregard of whether it was false or not." The threshold issue, then, is whether Mrs. Worrell–Payne was a public official in 1996.

■ Insofar as the First Amendment is concerned, the term "public official" applies "at the very least to those among the hierarchy of government employees who have, or appear to the public to have substantial responsibility for or control over the conduct of government affairs." *Rosenblatt v. Baer*, 383 U.S. 75, 85, 86 S.Ct. 669, 676, 15 L.Ed.2d 597 (1966). Given the size of the housing authority, given the services it was charged with providing, and given the executive director's role in providing those services, Mrs. Worrell–Payne qualified as a public official. For example, by 1996, the joint city-county housing authority had an annual operating budget of about nine million dollars. Besides overseeing the housing authority's budget, Mrs. Worrell–Payne managed approximately 30 employees, applied for private and public funds, ensured that the housing authority complied with all applicable rules and regulations, and acted as the housing authority's representative. As a result, Mrs. Worrell–Payne's position was one that "would invite public scrutiny and discussion of the person holding it, entirely apart from the scrutiny and discussion occasioned by the particular charges in controversy." *Id.* at 86 n. 13, 86 S.Ct. at 676 n. 13.

■ Neither Mrs. Worrell–Payne's firing nor the passage of two years time altered her status for First Amendment purposes. *Id.* at 87 n. 14, 86 S.Ct. at 677 n. 14; *Zerangue v. TSP Newspapers, Inc.*, 814 F.2d 1066, 1069 (5th Cir.1987); *Pierce v. Capital Cities Communications, Inc.*, 576 F.2d 495, 510 n. 76 (3d Cir.), *cert. denied,* 439 U.S. 861, 99 S.Ct. 181, 58 L.Ed.2d 170 (1978).[2] Consequently, to

---

2. This appears to be the rule whether the plaintiff is a public official or a public figure.

*See Partington v. Bugliosi*, 56 F.3d 1147, 1152 n. 8 (9th Cir.1995) ("every court of appeals

avoid summary judgment, she must present clear and convincing evidence from which a jury could find actual malice. *See Kaelin v. Globe Communications Corp.*, 162 F.3d 1036, 1039 (9th Cir.1998) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255–56, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)); *Crane v. Arizona Republic*, 972 F.2d 1511, 1517 (9th Cir.1992) (same). As explained above, actual malice means the *Statesman* either made statements it knew to be false or it made statements with a reckless disregard for their truth. *See Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 510, 111 S.Ct. 2419, 2429, 115 L.Ed.2d 447 (1991) (citing *New York Times Co.*, 376 U.S. at 279–80, 84 S.Ct. at 726). Since Mrs. Worrell–Payne alleges the *Statesman* defamed her by reporting allegations made by third parties, she may show recklessness by demonstrating that the *Statesman* had " 'obvious reasons to doubt the veracity of the informant or the accuracy of [their] reports.' " *Harte–Hanks Communications, Inc. v. Connaughton*, 491 U.S. 657, 688, 109 S.Ct. 2678, 2696, 105 L.Ed.2d 562 (1989) (quoting *St. Amant v. Thompson*, 390 U.S. 727, 732, 88 S.Ct. 1323, 1326, 20 L.Ed.2d 262 (1968)).

## "NEPOTISM," "ABSENTEEISM," AND "MISMANAGEMENT"

On a number of occasions, the *Statesman* reported that Mrs. Worrell–Payne was being (or had been) accused of "nepotism," "absenteeism," or "mismanagement." She says these words falsely described her performance as executive director, and based upon the information she made available to the media on May 14, 1996, the *Statesman* had obvious reasons to doubt the veracity of such accusations. Gannett rejects Mrs. Worrell–Payne's contentions. Among other

things, Gannett submits that words like "nepotism," "absenteeism," and "mismanagement" reflect non-actionable opinions.

■■■■ At least in cases involving media defendants, a statement on a matter of public concern "must be provable as false before there can be liability under state defamation law . . . ." *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 19, 110 S.Ct. 2695, 2706, 111 L.Ed.2d 1 (1990). A statement that is incapable of being disproved does not constitute an assertion of fact; it is a "pure" opinion. *Unelko Corp. v. Rooney*, 912 F.2d 1049, 1053 n. 2 (9th Cir.1990), *cert. denied*, 499 U.S. 961, 111 S.Ct. 1586, 113 L.Ed.2d 650 (1991). A pure opinion is not actionable. *See Partington v. Bugliosi*, 56 F.3d 1147, 1153 (9th Cir.1995). However, an author may not change the character of a factual statement by couching it in terms of an opinion. *See Milkovich*, 497 U.S. at 19, 110 S.Ct. at 2706. "[W]hile 'pure' opinions are protected by the First Amendment, a statement that 'may . . . imply a false assertion of fact' is actionable." *Partington*, 56 F.3d at 1153 (quoting *Milkovich*, 497 U.S. at 19, 110 S.Ct. at 2706). In applying this principle, the Ninth Circuit has drawn a distinction between two types of "opinion" statements: "those based on assumed or expressly stated facts, and those based on implied, undisclosed facts." *Standing Committee on Discipline v. Yagman*, 55 F.3d 1430, 1439 (9th Cir.1995) (citations omitted). "A statement of opinion based on fully disclosed facts can be punished only if the stated facts are themselves false and demeaning." *Id.* As the circuit court explained in *Yagman*, the "rationale behind this rule is straightforward: When the facts underlying a statement of opinion are disclosed, readers will understand they are getting the author's interpretation of

---

that has specifically decided this question has concluded that the passage of time does not

alter an individual's status as a limited purpose public figure").

the facts presented; they are therefore unlikely to construe the statement as insinuating the existence of additional, undisclosed facts." *Id.*

### A. Nepotism

■ Mrs. Worrell–Payne allowed her son, Isaac Worrell, to rent a house that had been constructed by the housing authority for persons with modest incomes. This led to the accusation of nepotism. To understand this accusation, it is necessary to have some familiarity with the housing authority's rent-to-own program.

In 1992 or 1993, the housing authority obtained interim financing for, and began the development of, a subdivision that was to consist of approximately 100 homes. According to Mrs. Worrell–Payne, it was anticipated that a program participant would be able to purchase a home after renting it for approximately three years. (Transcript of Meeting at 52.) The rent charged by the Housing Authority was slightly below the market rate. *Id.* at 55. In addition, program participants were advised that when it came time to make the purchase, the Housing Authority was prepared to " 'gift' all or part of the required downpayment to qualifying families." (Pamphlet regarding Hudgin's Place at 5.)

During the press conference on May 14, 1996, Mrs. Worrell–Payne said that Isaac was not quite 22 years old. (Transcript of Meeting at 128.) She also said that he had been renting a house from the Housing Authority for about a year and a half. *Id.* at 129. In all probability, then, Isaac moved into the house during the Fall of 1994. At that point, he would have been an able-bodied, 20 year-old young man with no true dependents.

The record further reflects that Isaac Worrell applied to participate in the rent-to-own program some months before he was allowed to move into a house. However, Mrs. Worrell–Payne would not let him participate until she received approval from the housing authority's five commissioners. *Id.* at 108. The commissioners' minutes reflect that Mrs. Worrell–Payne discussed the matter with them at a meeting on September 26, 1994. Given the policy adopted by the commissioners, and given the fact her son's application was processed no differently than anyone else's, Mrs. Worrell–Payne argues it should have been obvious to the *Statesman* that the charge of nepotism was baseless.

Before addressing Mrs. Worrell–Payne's argument with respect to the existence of actual malice, it is necessary to determine whether an allegation of nepotism implies a statement of fact capable of being proved false. *Dodds v. American Broadcasting Co.,* 145 F.3d 1053, 1064 (9th Cir. 1998), *cert. denied,* 525 U.S. 1102, 119 S.Ct. 866, 142 L.Ed.2d 769 (1999). The term "nepotism" is commonly understood to mean "favoritism shown to relatives, [especially] in appointment to desirable positions." Webster's New World Dictionary 909 (3d College Ed.1986). As such, the accusation is partially verifiable. A jury could examine the circumstances leading to the commissioners' decision to approve Isaac Worrell's participation in the rent-to-own program, and a jury could examine the manner in which his application was processed. However, an accusation of nepotism is more than an assertion that a public official conferred a benefit upon a relative. It is also a value judgment about the official's behavior. In this case, for example, Mrs. Worrell–Payne's critics insisted her conduct was inappropriate even if it was legal. Statements of that sort can never be disproved.

Furthermore, the *Statesman* printed the essential facts upon which the allegation of nepotism was based, including Mrs. Worrell–Payne's defense. In an article dated May 15, 1996, a reporter wrote, "She al-

lowed her son, Isaac Worrell, to live in Hudgins place but denied he received preferential treatment. *The board approved the move,* she said." (Emphasis added.) Thus, the *Statesman* never implied to its readers that it was privy to additional, undisclosed facts.

Finally, the *Statesman* had no reason to doubt the accuracy of the essential facts upon which the accusation of favoritism was based. Mrs. Worrell–Payne was the executive director of the Housing Authority. As executive director, she had considerable influence in shaping the rules regarding eligibility. No doubt she was aware her son stood to receive significant financial benefits if permitted to participate in the rent-to-own program. Indeed, that is exactly what happened when the commissioners approved the policy. Not only was her son allowed to rent a house for less than he would have paid on the open market, but he was led to believe that the Housing Authority would give him money for a downpayment when he became eligible to purchase the house.

### B. Absenteeism

■ Mrs. Worrell–Payne's critics charged that she was away from her office too much of the time. The *Statesman* used phrases such as "frequent absenteeism" and "excessive absenteeism" to summarize their accusations. Mrs. Worrell–Payne argues that the *Statesman*'s use of these phrases was reckless because the *Statesman* knew she served as a consultant for other housing authorities in the region, knew her consulting produced income for the Boise City/Ada County Housing Authority, and knew she had to leave her office from time to time to meet with clients.

The problem with Mrs. Worrell–Payne's argument is that the *Statesman* had no reason to doubt the accuracy of the essential facts upon which the accusation of

absenteeism was based, *i.e.,* that Mrs. Worrell–Payne had been away from her Boise office on a significant number of occasions. Indeed, as even Mrs. Worrell–Payne conceded at the time, the issue was not whether she was away from her office, but whether it was appropriate for her to be away as much as she was. She thought her absences were fully justified. Her critics disagreed, hence their accusation of absenteeism. Significantly, that accusation is not a statement of fact which is capable of being disproved. Instead, it is a value judgment that Mrs. Worrell–Payne's absences from her office were inappropriate even if, as the *Statesman* reported on the fifteenth and sixteenth of May, 1996, she was working on other cities' housing problems.

### C. Mismanagement

■ On a number of occasions, Mrs. Worrell–Payne was accused of "mismanagement." Before addressing the issue of actual malice, it is important to note that an accusation of mismanagement is not an assertion of fact. There is no universally accepted standard for evaluating an executive's performance. Whether any executive's performance is "good" or "bad" is inherently subjective. Mrs. Worrell–Payne thought she was doing well; her critics disagreed. They expressed their disagreement by accusing her of mismanagement. Their accusation is not one that can be proved false.

The accusation of mismanagement appears to have been based upon a number of circumstances, including the following: the status of the rent-to-own program; the fact Mrs. Worrell–Payne sometimes used a housing authority vehicle for personal business; the amount of money Mrs. Worrell–Payne spent on travel; the amount of compensation she paid to one of her employees; and the fact a former employee

obtained a judgment against the housing authority on the ground she had been fired in violation of her contractual and civil rights. Mrs. Worrell–Payne argues that the *Statesman*'s reporting about those issues was reckless.

### 1. Status of the program

The *Statesman* printed a number of stories indicating that Mrs. Worrell–Payne was being criticized because it was unclear to tenants in the rent-to-own program when, or under what circumstances, they could purchase the homes they were renting. Mrs. Worrell–Payne argues that the *Statesman*'s reporting was reckless because she gave documents to the *Statesman* describing the nature of the rent-to-own program, and because she explained to one of the *Statesman*'s reporters that she was in process of helping several families obtain financing. However, even with the information Mrs. Worrell–Payne provided, the *Statesman* had no obvious reason to doubt the assertion that rent-to-own tenants were confused and alarmed. Although Mrs. Worrell–Payne may have developed general guidelines for the rent-to-own program, there is no evidence that, prior to May of 1996, the housing authority had entered into binding agreements with tenants. Thus, serious questions existed with respect to the status of the program.

The unfavorable publicity Mrs. Worrell–Payne received during May of 1996 came at an awkward time in the life of the rent-to-own program. At that point, the housing authority was attempting to arrange new financing for the subdivision. Some of Mrs. Worrell–Payne's critics, including the *Statesman,* were concerned that the housing authority would be unable to obtain new financing and that taxpayers might be called upon to bail out the program. Mrs. Worrell–Payne argues that the *Statesman*'s reporting was reckless

because she provided information indicating that the program was in no danger of default. However, at the time the *Statesman* questioned the financial health of the rent-to-own program, the housing authority had yet to obtain needed financing. Furthermore, while the *Statesman* expressed concern about the housing authority's ability to do so, the *Statesman* acknowledged in the same article [3] that the mayor of the City of Boise was of the opinion that investors would be found and that public credit would not be needed. By disclosing the mayor's opposing opinion, the *Statesman* put its readers on notice that its concern about default was simply one view of the situation. The *Statesman* never implied that it was in possession of facts not available to its readers.

### 2. Use of vehicle

In 1994 or 1995, the commissioners authorized $25,000 for the purchase of a four-wheel drive vehicle for the executive director's use. From time to time, Mrs. Worrell–Payne used the vehicle for personal travel. On one occasion, she drove the vehicle to the State of Oregon as part of a family vacation. The *Statesman* was sharply critical of her practice of using the executive director's vehicle for personal transportation. Mrs. Worrell–Payne argues the *Statesman*'s criticism was reckless because she informed one of its reporters that the commissioners authorized her to utilize the vehicle for personal travel. However, the *Statesman* disclosed to its readers in an article dated May 15, 1996, that Mrs. Worrell–Payne was defending her conduct on the ground that the privilege of using the vehicle for personal transportation was part of her compensation as executive director. Since Mrs. Worrell–Payne never denied using the ve-

---

**3.** The article is dated May 23, 1996.

hicle for personal travel, and since the *Statesman* printed her justification for doing so, the *Statesman*'s criticism of Mrs. Worrell–Payne's conduct is protected.

### 3. Travel

During her tenure as executive director, Mrs. Worrell–Payne traveled extensively. Many of the trips were to meetings sponsored by professional associations. The *Statesman* was sharply critical of the extent to which she traveled, and the sums the housing authority expended on her travel. Mrs. Worrell–Payne argues that the *Statesman*'s criticism was reckless because the *Statesman* knew that the housing authority's commissioners approved her travel budget. However, even with the information Mrs. Worrell–Payne provided, the *Statesman* had no reason to doubt the essential facts upon which the stories were based. Mrs. Worrell–Payne had persuaded the commissioners to approve generous travel budgets, and she made extensive use of the money budgeted for travel.

### 4. Compensation for an employee

Mrs. Worrell–Payne hired Mr. Dale Greenhalgh as the housing authority's director of development, modernization, and maintenance. As part of his compensation package, the housing authority paid his rent in an apartment complex in Boise. The *Statesman* criticized that arrangement on the ground that Mr. Greenhalgh was staying in a "luxury" apartment complex. Mrs. Worrell–Payne argues that the *Statesman*'s criticism was reckless because the *Statesman* knew the housing authority's commissioners approved the compensation Mr. Greenhalgh received. However, even with the information Mrs. Worrell–Payne provided, the *Statesman* had no reason to doubt that Mr. Greenhalgh received the benefit for which Mrs. Worrell–Payne was being criticized.

### 5. Lawsuit by former employee

In 1989, a former employee of the housing authority obtained a judgment against the housing authority based upon claims of breach of contract, denial of procedural due process, and retaliation. *Lubcke v. Boise City/Ada County Housing Authority,* 124 Idaho 450, 454–55, 860 P.2d 653 (1993). On appeal, the Supreme Court of the State of Idaho affirmed with respect to liability, but remanded the case to the trial court for further proceedings with respect to damages. *Id.* at 462, 467–78, 860 P.2d 653. In 1994, the housing authority settled with the former employee. The *Statesman* cited the lawsuit as an instance of mismanagement. Mrs. Worrell–Payne does not allege the *Statesman*'s reporting of the lawsuit was reckless, nor could she persuasively make such an allegation. The incident was a matter of public record.

### D. Summary

There are at least three reasons why the *Statesman*'s use of the words "nepotism," "absenteeism," and "mismanagement" is protected by the First Amendment. Accusations of this sort cannot be proved false; the *Statesman* disclosed the essential facts upon which each accusation was based; and the *Statesman* had no obvious reason to doubt the accuracy of the essential facts.

### DEFAMATORY IMPLICATIONS

Mrs. Worrell–Payne alleges that many of the *Statesman*'s articles impliedly defamed her. Assuming the tort of defamation by implication exists in Idaho, the First Amendment poses at least two obstacles to this claim. First, Mrs. Worrell–Payne must demonstrate that the disputed articles are reasonably capable of sustaining the false implications she attributes to them. *See Dodds,* 145 F.3d at 1063. Second, she must present clear and convincing evidence from which a jury could find that

the *Statesman* actually intended to convey the false impressions. *See id.* at 1063–64.

■ On May 28, 1996, the *Statesman* reported that the housing authority commissioners had voted 3–0 the previous evening to require Mrs. Worrell–Payne to obtain written permission from the commissioners before traveling out of state at government expense. Although Mrs. Worrell–Payne does not deny that the commissioners did just what the *Statesman* said they did, she says the article falsely implies at least three statements: (1) that previously she did not need to obtain permission before she traveled out of state; (2) that all of her previous travel was at government expense; and (3) that her previous travel was not related to her work.

A fair reading of the article does not support Mrs. Worrell–Payne's interpretation of it. Insofar as the first issue is concerned, the article explains that the former housing authority commissioners had approved her travel budget. Thus, the article suggests that Mrs. Worrell–Payne had obtained permission from the former commissioners to travel out of state. Insofar as the second issue is concerned, the article explains that written permission would be required only when she desired to travel out of state at government expense. By requiring permission only for government-subsidized travel, the commissioners implied that some of Mrs. Worrell–Payne's travel was not at government expense. Insofar as the third issue is concerned, nothing in the article indicates the commissioners thought her previous government-subsidized travel was unrelated to her work. If anything, the article implies that the commissioners were displeased with the amount of money Mrs. Worrell–Payne spent on travel.

■ On June 5, 1996, the *Statesman* reported that Mrs. Worrell–Payne's contract with the housing authority had not been approved by federal officials, and that the contract might not be valid. Mrs. Worrell–Payne argues that the *Statesman*'s article falsely implies that she should have obtained federal approval. However, even if federal approval was not required, she has failed to present clear and convincing evidence that the *Statesman* had obvious reason to doubt statements by various officials that approval was critical to the contract's validity.

■ On June 7, 1996, the *Statesman* published an article indicating that the housing authority's attorney was "dropping" the housing authority as a client. Mrs. Worrell–Payne argues that the "headline implies that the ethical attorney was washing his hands of a dishonest client." Contrary to Mrs. Worrell–Payne, neither the headline nor the article support such an interpretation. The *Statesman*'s article states quite clearly that the attorney gave no reasons for his decision to terminate the attorney-client relationship. If anything, the article implies that the attorney supported Mrs. Worrell–Payne.

■ On June 13, 1996, the *Statesman* printed an article criticizing Mrs. Worrell–Payne's failure to apply on behalf of the housing authority for certain grants. Mrs. Worrell–Payne argues that the article falsely implies that she should have applied for the grants. According to her, it was unclear whether the housing authority was eligible for the funds in question, and, in any event, the commissioners made a conscious decision not to apply.

Mrs. Worrell–Payne is at least partially correct. The *Statesman*'s article of June 13, 1996, does imply that she should have applied for the grant(s). However, whether someone ought to have done something is a matter of opinion; it is not something that can be disproved. Here, Mrs. Worrell–Payne does not deny that she chose

not to apply for the grant(s). Since the facts upon which the *Statesman*'s opinion was based were fully disclosed and undisputed, its assessment of Mrs. Worrell–Payne's conduct, whether labeled as an "implication" or an "opinion," is not actionable.

■ On June 21, 1996, the *Statesman* published an article comparing Mrs. Worrell–Payne's predicament to that of housing officials in two other cities who resigned under pressure. The article indicates that Mrs. Worrell–Payne and her counterpart in Seattle were guilty of nepotism, favoritism, and mismanagement. Mrs. Worrell–Payne argues that the article falsely implies that her situation was comparable to that of the other two officials.

In attacking this article, Mrs. Worrell–Payne overlooks an important principle: whether two situations are comparable is largely a matter of opinion. As with other types of opinions, a comparison is not actionable when a newspaper fully discloses the facts upon which the comparison is based and the newspaper has no obvious reason to doubt the validity of the underlying facts. Here, the article sets forth the facts upon which the *Statesman* relied to demonstrate that Mrs. Worrell–Payne's conduct was similar to that of the other two officials. As a result, the *Statesman*'s readers were in a position to decide for themselves whether the comparison was valid. Since, as explained above, the *Statesman* had no obvious reason to doubt the veracity of the facts upon which its comparison was based, the article is not actionable.

■ On June 28, 1996, the *Statesman* reported that Mrs. Worrell–Payne was going to represent Idaho housing officials at a conference of the National Association of Housing and Redevelopment Officials. Mrs. Worrell–Payne says the article falsely implies that there was "something

wrong" with her representing her former colleagues at the conference. In addition, she says the article falsely implies that she was fired because of mismanagement.

Mrs. Worrell–Payne is correct in asserting that the article of June 28, 1996, implies disapproval of her role as the representative of Idaho housing officials. However, this aspect of the article is not an implication of fact; it is an opinion about her fitness to serve. As such, it is evaluated as any other opinion is evaluated. Significantly, while the article mentions the fact Mrs. Worrell–Payne was fired, it also quotes a housing official in Pocatello, Idaho, as saying that her discharge "was a real miscarriage of justice." Thus, the *Statesman*'s readers were put on notice that responsible officials disagreed with the *Statesman*'s assessment of the situation. Since the *Statesman* had no reason to doubt that Mrs. Worrell–Payne was slated to go the conference of housing officials despite the fact she'd been fired, the *Statesman*'s opinion concerning the propriety of that trip is not actionable.

■ There is a second prong to Mrs. Worrell–Payne's analysis of the article of June 28, 1996. As she notes, the article says, "Worrell–Payne was dismissed on June 19 after allegations of mismanagement surfaced." Mrs. Worrell–Payne says this statement falsely implies a cause-and-effect relationship between her alleged mismanagement and the commissioners' decision to fire her. This prong of her argument differs from the first prong in that the implication Mrs. Worrell–Payne attributes to the article—*i.e.,* that she was fired because of her alleged acts of mismanagement—is one of fact. The issue, then, is whether the article is capable of sustaining the implication she attributes to it. In that regard, the article states only that Mrs. Worrell–Payne was fired "*after*

allegations of mismanagement surfaced." (Emphasis added.) Although the article certainly implies that Mrs. Worrell–Payne's alleged mismanagement was a factor in the commissioners' decision to fire her, the article does not purport to say that it was the only factor in their decision. Furthermore, the *Statesman* had no obvious reason to doubt that her alleged conduct figured in the commissioners' ultimate decision.

The articles discussed above are not the only ones upon which Mrs. Worrell–Payne relies to establish her claim of defamation by implication. However, this group of articles is representative of the whole. As a review of these articles indicates, Mrs. Worrell–Payne's defamation-by-implication claim suffers from three defects. First, she consistently fails to distinguish between implications that can be disproved and those than cannot. Second, many of the articles are incapable of sustaining the implications she attributes to them. Finally, she cannot establish that the *Statesman* had reason to doubt the veracity of the facts allegedly implied by its articles.

### FAIR REPORT PRIVILEGE

 Some of the articles of which Mrs. Worrell–Payne complains were reports concerning meetings held by the housing authority. In the State of Idaho, "fair and true" reports of "public official proceedings" are privileged. I.C. 6–713(4). *See Wiemer v. Rankin,* 117 Idaho 566, 573, 790 P.2d 347, 357 (1990); *cf. Ronwin v. Shapiro,* 657 F.2d 1071, 1075 (9th Cir.1981) (concluding that the Supreme Court of the State of Arizona would adopt a "fair report" privilege consistent with the Restatement (Second) of Torts § 611). While Mrs. Worrell–Payne does not dispute the existence of a fair report privilege, she argues generally that the *Statesman*'s articles were neither fair nor true.

The Supreme Court of the State of Idaho has not determined the scope of the fair report privilege, at least as it applies to media defendants. When the Idaho Supreme Court addresses that issue, it likely will look to the Restatement (Second) of Torts for guidance. *See generally Peterson v. Idaho First Nat'l Bank,* 117 Idaho 724, 791 P.2d 1303 (Idaho 1990) ("we will review each comment on a case by case basis, as the occasion arises, to determine if such comment warrants incorporation into the common law of Idaho").

Section 611 of the Restatement (Second) of Torts reflects the common law understanding of the fair report privilege. As the *Statesman* points out, comment b states in part, "The privilege stated in this Section permits a person to publish a report of an official action or proceeding or of a public meeting that deals with a matter of public concern, even though the report contains what he knows to be a false and defamatory statement." However, to be privileged, a report must be a substantially correct account of the proceeding. Restatement (Second) of Torts § 611 comment f (1977). "[A]lthough it is unnecessary that the report be exhaustive and complete, it is necessary that nothing be omitted or misplaced in such a manner as to convey an erroneous impression to those who hear or read it, . . . ." *Id.*

Assuming the Idaho Supreme Court interprets I.C. 6–713(4) in a manner consistent with the comments to § 611 of the Restatement, it appears that a number of the *Statesman*'s articles are privileged in whole or in part. At a minimum, the following articles contain reports of public official proceedings: May 15, 1996; May 28, 1996; June 4, 1996; June 8, 1996; June 13, 1996; June 20, 1996; October 9, 1996; and January 16, 1997. Mrs. Worrell–Payne has not attempted to demonstrate that the accounts of public official proceedings contained in these articles are not substantially correct. Thus, to the extent

these articles describe public official proceedings, they are privileged.

## MISCELLANEOUS ALLEGATIONS

■ During June of 1996, the *Statesman* published several articles indicating that Mrs. Worrell–Payne was being investigated by local and federal authorities. She argues that the *Statesman* had no way of knowing that investigations were under way. However, it is undisputed that on May 16, 1996, law enforcement officers seized a number of items from the housing authority pursuant to a search warrant. Since it is well established that a search warrant may not be issued absent "a fair probability that contraband or evidence of a crime will be found in" the place the officer seeks to search, *Illinois v. Gates*, 462 U.S. 213, 238, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983), the *Statesman* had no obvious reason to doubt that criminal investigations were under way.

■ On April 8, 1998, the *Statesman* reported that Mrs. Worrell–Payne was working as a housing consultant in the State of New Jersey "nearly two years after she was fired as head of the Boise City/Ada County Housing Authority amid allegations of corruption." In addition, the article went on to recount other accusations leveled against her, including for "being absent too often; for allowing her son to live in a reduced-rent house; for using a $25,000 authority-owned Chevy Blazer for personal business." Mrs. Worrell–Payne objects to this article on at least two grounds. For one thing, since she had done her best after her termination to stay out of the limelight, she argues that the *Statesman*'s article reflects a malicious intent to harm her. For another, she argues that the accusations reported in the article were false. Neither of her objections has merit. As noted above, the considerations that require her to prove actual malice did not erode with the passage of time. In that regard, she has failed to present evidence from which a jury could find that the *Statesman* had obvious reason to doubt the facts upon which the accusation of corruption was based. Finally, since the word "corruption" reflects an accusation that cannot be proved false, and the *Statesman* disclosed the facts upon which that accusation was based, the *Statesman*'s use of that word is not actionable.

## OTHER TORTS

■ Besides alleging defamation (or libel) and defamation by implication, Mrs. Worrell–Payne also alleges invasion of privacy, intentional infliction of emotional distress, intentional interference with contract, and intentional interference with a prospective economic advantage. The fact the First Amendment shields the *Statesman*'s reporting against Mrs. Worrell–Payne's defamation claims means her claims of invasion of privacy and intentional infliction of emotional distress necessarily fail. *See Hustler Magazine v. Falwell*, 485 U.S. 46, 56, 108 S.Ct. 876, 882, 99 L.Ed.2d 41 (1988); *Dworkin v. Hustler Magazine*, 867 F.2d 1188, 1193 (9th Cir.), *cert. denied*, 493 U.S. 812, 110 S.Ct. 59, 107 L.Ed.2d 26 (1989). That leaves Mrs. Worrell–Payne's claims for intentional interference with contract and intentional interference with a prospective economic advantage. The elements of the two causes of action are much the same. *See Highland Enterprises, Inc. v. Barker*, 133 Idaho 330, 338 n. 3, 986 P.2d 996 (1999). Both require proof that the interference the defendant is alleged to have committed "was wrongful by some measure beyond the fact of the interference itself (i.e. that the defendant interfered for an improper purpose or improper means)." *Id.* at 338, 986 P.2d 996. In an analogous case, the Ninth Circuit held that where a plaintiff's claims for tortious interference with business relationships were based upon essentially the same facts as the plaintiff's defamation

claims, and the plaintiff's tortious interference claims required proof of wrongfulness, they were subject to the same First Amendment standard as the plaintiff's defamation claims. *See Unelko Corp.*, 912 F.2d at 1057–58. Mrs. Worrell–Payne does not disagree with that proposition. (Memorandum in Opposition at 22.) Since none of the *Statesman*'s articles contain actionable statements of fact, her claims for intentional interference with contract and intentional interference with a prospective economic advantage must be dismissed.

## CONCLUSION

Reduced to its essence, Mrs. Worrell–Payne's complaint is that the *Statesman* refused to present her side of the dispute. To a certain extent, she's correct. Not long after the story broke, the *Statesman* apparently made an editorial judgment that Mrs. Worrell–Payne had forfeited the public trust. From that point on, the *Statesman* tended to emphasize those facts which supported its interpretation of the situation. While the *Statesman* printed some of Mrs. Worrell–Payne's responses to her critics' accusations, it is clear that her attempts to defend herself were not presented with the same vigor as her critics' charges. If a newspaper had a duty to be scrupulously fair, an argument could be made that the *Statesman* breached that duty. However, the Founding Fathers decided not to impose such an obligation upon newspapers. *See Miami Herald Publishing Co. v. Tornillo*, 418 U.S. 241, 256, 94 S.Ct. 2831, 2839, 41 L.Ed.2d 730 (1974) ("A responsible press is an undoubtedly desirable goal, but press responsibility is not mandated by the Constitution and like many other virtues it cannot be legislated."). Frustrating though it may be to Mrs. Worrell–Payne, the *Statesman* had no legal obligation to present a balanced report of the controversy. *Cf. Levan v. Capital Cities/ABC, Inc.*, 190 F.3d 1230,

1243 (11th Cir.1999) ("[t]he decision to air the interview of one person but not another is at heart an editorial decision"), *cert. denied*, 528 U.S. 1198, 120 S.Ct. 1262, 146 L.Ed.2d 118 (2000); *Machleder v. Diaz*, 801 F.2d 46, 55 (2d Cir.1986) ("recovery for a false light tort may not be predicated on a rule that holds a media defendant liable for broadcasting truthful statements and actions because it failed to include additional facts which might have cast the plaintiff in a more favorable or balanced light"), *cert. denied*, 479 U.S. 1088, 107 S.Ct. 1294, 94 L.Ed.2d 150 (1987). In *Tornillo*, the Supreme Court concluded with the following observation:

> A newspaper is more than a passive receptacle or conduit for news, comment, and advertising. The choice of material to go into a newspaper, and the decisions made as to limitations on the size and content of the paper, and treatment of public issues and public officials—whether fair or unfair—constitute the exercise of editorial control and judgment. It has yet to be demonstrated how governmental regulation of this crucial process can be exercised consistent with First Amendment guarantees of a free press as they have evolved to this time.

*Id.* at 258, 94 S.Ct. at 2840 (footnote omitted). Those words continue to ring true.

**IT IS HEREBY ORDERED:**

The motion for summary judgment brought by Gannett Co., Inc., is granted. The plaintiff's claims are dismissed with prejudice.

**IT IS SO ORDERED.** The District Court Executive is hereby directed to enter this order and furnish copies to counsel.