Paul Finebaum and Capstar Operating Corporation d/b/a WERC AM/FM Radio ("WERC") petitioned this Court for permission to appeal a trial court order denying in part their motion for a summary judgment. We granted their petition. We now reverse the partial denial of the motion for a summary judgment filed by Finebaum and WERC, and we remand the cause for entry of an appropriate judgment.
Plaintiff Richard Matthew Coulter sued Finebaum and WERC for defamation, conspiracy, the tort of outrage, and invasion of privacy. The gravamen of each theory was a comment by Finebaum about Coulter, a sportscaster, during Finebaum's December 15, 1998 radio talk show. Specifically, Coulter complained that, by comparing a conversation on Coulter's own radio program between Coulter and another male participant with "oral sex," Finebaum had, on his program, implied that Coulter "is a homosexual."
Finebaum and WERC moved for a summary judgment on several grounds. The first was that, because Finebaum's statement was an expression of opinion, it was not defamatory. The second ground was that, because Finebaum's statement was "rhetorical hyperbole" protected by theFirst Amendment to the United States Constitution, the statement was not actionable. The third ground was that Coulter's status as a public figure required him to prove that Finebaum made his statement with actual malice, which Coulter could not prove. The last ground was that Finebaum's statement did not cause Coulter any physical or mental injury or any economic loss. The trial court granted summary judgment in favor of Finebaum and WERC on Coulter's conspiracy claim, but denied summary judgment on Coulter's other claims.
Finebaum was a sports journalist who hosted a daily sports talk radio program. Coulter was likewise a sports journalist who hosted his own radio talk program. Coulter had been a sports journalist, either on television or on radio, for over 20 years.
On December 15, 1998, on his radio program, Finebaum was discussing the motivation of college football recruiters and the deferential treatment that recruiters receive from sportscasters and coaches. Finebaum took a telephone call from a caller identified as "Reg from Altadena." The following colloquy occurred between Finebaum and "Reg":
 "[Reg:] Paul, Pat [Dye] wasn't by any means the first to ever reveal that about these recruiting people, uh, that's been going on. Doug Layton used to hate to even have to have them on during recruiting season, and he said the same thing that Pat Dye said about them.
 "[Finebaum:] Well, the difference is with Pat Dye, he had knowledge that this person had tried to hurt his program and tried to help Alabama. *Page 1123 
 "[Reg:] Now I don't have any basis for what I was fixin' to tell you, I think the guy that you had always talked to, Jeff Wineburger, I think he does the same thing in Tennessee.
 "[Finebaum:] I've said before, after he's been on, during conversations with him.
 "[Finebaum:] Listen, I don't believe any of these people. We have them on, as I mentioned, for entertainment purposes and I think they all, I mean, maybe, this is the first year we've had more than one on, I think it's interesting to listen to them, and I think there can be some information weaned from them, but I. . . .
 "[Reg:] I really don't, I'd rather listen to someone like you . . ., those guys, they play off of the fans. . . .
"[Finebaum:] Oh, they're vultures. . . .
 "[Reg:] Yeah, they play off the fans, and I doubt that there is any football coach that would recruit based on what a recruiter says. . . .
 "[Finebaum:] Reg, you would be amazed at how many football coaches suck up to these guys. . . . [Y]ou'd be amazed at how close some of them are in proximity to where we're talking right now and the reason they do is simple — so these people will go on their shows and talk about what great coaches they are, what great — I heard a program this morning that was easily the most embarrassing 30 or 40 minutes of radio I have ever heard in my life.
"[Reg:] Which one is it?
 "[Finebaum:] It was on, I can't, what's the name of the show, Hey Tide, Tide something or other.
"[Reg:] Oh yeah, I don't listen to that.
 "[Finebaum:] It was Matt Coulter, and I can't remember the other clown, it, I mean, these two guys really slobbered over each other, I mean, I really thought they were going to start performing oral sex on one another, it was so sickening.
 "[Reg:] Well, let me ask you a more important thing. Has there anything, any inkling what is going to become of this investigation on Alabama's basketball team?
"[Finebaum:] We should know soon.
"[Reg:] Yeah, okay. Well you have yourself a good day.
"[Finebaum:] Thank you.
"[Bob Lochamy:] So, they got excited?
 "[Finebaum:] Oh my goodness. This was the most repulsive thing I've ever heard. I mean, I just happened to flip on the radio to find something on, and these guys, I mean, you would have thought Alabama had just won its seventh straight national championship.
"[Lochamy:] Consecutive, yes. . . ." (Emphasis added.)
Finebaum made no other reference to Coulter.
In Coulter's deposition, he admitted that he had "been a public sports figure and analyst and sportscaster for . . . seventeen to eighteen years. . . ." In Finebaum's deposition, he testified that his December 15, 1998 statement about Coulter's radio program was "an attempt to satire, an attempt to humor, trying to characterize a little bit about our business, the business of sports and sports entertainment." Coulter's attorney asked Finebaum, "Did you make the statement with any animosity toward Mr. Coulter?" Finebaum replied, "Absolutely not." Coulter's attorney asked Finebaum, "So you were not saying that [Coulter] was gay?" Finebaum replied, "Absolutely not."
"`[T]he freedom to speak one's mind is not only an aspect of individual liberty — and thus a good unto itself — but also is essential to the common quest for truth and the vitality of society as a *Page 1124 
whole.'" Hustler Magazine v. Falwell, 485 U.S. 46, 50-51 (1988) (quotingBose Corp. v. Consumers Union of United States, Inc., 466 U.S. 485,503-04 (1984)).
 "`Freedom of discussion, if it would fulfill its historic function in this nation, must embrace all issues about which information is needed or appropriate to enable the members of society to cope with the exigencies of their period.' Thornhill v. Alabama, 310 U.S. 88, 102 [(1940)]. Because the threat or actual imposition of pecuniary liability for alleged defamation may impair the unfettered exercise of these First Amendment freedoms, the Constitution imposes stringent limitations upon the permissible scope of such liability."
Greenbelt Coop. Publ'g Ass'n, Inc. v. Bresler, 398 U.S. 6, 12 (1970) (footnote omitted).
 "Hypothetically, it may be possible for someone to become a public figure through no purposeful action of his own, but the instances of truly involuntary public figures must be exceedingly rare. For the most part those who attain this status have assumed roles of especial prominence in the affairs of society. Some occupy positions of such persuasive power and influence that they are deemed public figures for all purposes. More commonly, those classed as public figures have thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved. In either event, they invite attention and comment."
Gertz v. Robert Welch, Inc., 418 U.S. 323, 345 (1974). A public figure
 "cannot recover [for defamation] unless he proves by clear and convincing evidence that the defendant published the defamatory statement with actual malice, i.e., with `knowledge that it was false or with reckless disregard of whether it was false or not.' New York Times Co. v. Sullivan, 376 U.S. 254, 279-280 (1964). Mere negligence does not suffice. Rather, the plaintiff must demonstrate that the author [or speaker] `in fact entertained serious doubts as to the truth of his publication,' St. Amant v. Thompson, 390 U.S. 727, 731 (1968), or [that he] acted with a `high degree of awareness of . . . probable falsity,' Garrison v. Louisiana, 379 U.S. 64, 74 (1964)."
Masson v. New Yorker Magazine, Inc., 501 U.S. 496, 510 (1991), andSanders v. Smitherman, 776 So.2d 68, 71 (Ala. 2000) (emphasis added).
 "[P]ublic figures and public officials may not recover for the tort of intentional infliction of emotional distress by reason of publications such as the one here at issue without showing in addition that the publication contains a false statement of fact which was made with `actual malice,' i.e., with knowledge that the statement was false or with reckless disregard as to whether or not it was true. This is not merely a `blind application' of the New York Times standard, see Time, Inc. v. Hill, 385 U.S. 374, 390 (1967), it reflects our considered judgment that such a standard is necessary to give adequate `breathing space' to the freedoms protected by the First Amendment."
Falwell, 485 U.S. at 56. When a public official or public figure alleges a defamatory meaning, a defamatory implication, or a defamatory innuendo, "[n]ot only must the plaintiff establish that *Page 1125 
the statement is susceptible of a defamatory meaning which the defendants knew to be false or which the defendants published with reckless disregard for its potential falsity, but also that the defendants intended to imply or were reckless toward the implications." Saenz v.Playboy Enters., Inc., 841 F.2d 1309, 1318-19 (7th Cir. 1988) (footnote omitted). See Dodds v. American Broad. Co., 145 F.3d 1053, 1063-64 (9th Cir. 1998); Newton v. National Broad. Co., 930 F.2d 662, 681 (9th Cir. 1990); Tilton v. Capital Cities/ABC Inc., 905 F. Supp. 1514, 1523
(N.D.Okla. 1995); Worrell-Payne v. Gannett Co., 134 F. Supp.2d 1167,1176-77 (D.Idaho). See also Loveless v. Graddick, 295 Ala. 142, 148,325 So.2d 137, 142 (1975). "`[T]he most repulsive speech enjoys immunity provided it falls short of a deliberate or reckless untruth.'" OldDominion Branch No. 496, Nat'l Ass'n of Letter Carriers v. Austin,418 U.S. 264, 284 (1974) (quoting Linn v. United Plant Guard Workers ofAmerica, Local 114, 383 U.S. 53, 63 (1966)).
The First Amendment also protects mere rhetorical hyperbole or statements that cannot reasonably be interpreted as representing actual facts. Milkovich v. Lorain Journal Co., 497 U.S. 1, 20 (1990); LetterCarriers, 418 U.S. at 284-86; Greenbelt Coop. Publ'g Ass'n,398 U.S. at 14. See also Harris v. School Annual Publ'g Co., 466 So.2d 963, 965
(Ala. 1985).
 "We have also recognized constitutional limits on the type of speech which may be the subject of state defamation actions. In Greenbelt Cooperative Publishing Assn., Inc. v. Bresler, 398 U.S. 6 (1970), a real estate developer had engaged in negotiations with a local city council for a zoning variance on certain of his land, while simultaneously negotiating with the city on other land the city wished to purchase from him. A local newspaper published certain articles stating that some people had characterized the developer's negotiating position as `blackmail,' and the developer sued for libel. Rejecting a contention that liability could be premised on the notion that the word `blackmail' implied the developer had committed the actual crime of blackmail, we held that `the imposition of liability on such a basis was constitutionally impermissible — that as a matter of constitutional law, the word "blackmail" in these circumstances was not slander when spoken, and not libel when reported in the Greenbelt News Review.' Id., at 13. Noting that the published reports `were accurate and full,' the Court reasoned that `even the most careless reader must have perceived that the word was no more than rhetorical hyperbole, a vigorous epithet used by those who considered [the developer's] negotiating position extremely unreasonable.' Id., at 13-14. See also Hustler Magazine, Inc. v. Falwell, 485 U.S. 46, 50 (1988) (First Amendment precluded recovery under state emotional distress action for ad parody which `could not reasonably have been interpreted as stating actual facts about the public figure involved'); Letter Carriers v. Austin, 418 U.S. 264, 284-286 (1974) (use of the word `traitor' in literary definition of a union `scab' not basis for a defamation action under federal labor law since used `in a loose, figurative sense' and was `merely rhetorical hyperbole, a lusty and imaginative expression of the contempt felt by union members').
". . . . *Page 1126 
 " . . . [T]he Bresler-Letter Carriers-Falwell line of cases provides protection for statements that cannot `reasonably [be] interpreted as stating actual facts' about an individual. Falwell, 485 U.S., at 50. This provides assurance that public debate will not suffer for lack of `imaginative expression' or the `rhetorical hyperbole' which has traditionally added much to the discourse of our Nation. See id., at 53-55."
Milkovich, 497 U.S. at 16-20 (emphasis added).
 "`[E]ven where the utterance is false, the great principles of the Constitution which secure freedom of expression in this area preclude attaching adverse consequences to any except the knowing or reckless falsehood. Debate on public issues will not be uninhibited if the speaker must run the risk that it will be proved in court that he spoke out of hatred . . . .' Garrison v. Louisiana, 379 U.S. 64, 73
[(1964)]. See also Beckley Newspapers Corp. v. Hanks, 389 U.S. 81, 82 [(1967)]. And the constitutional prohibition in this respect is no different whether the plaintiff be considered a `public official' or a `public figure.' Curtis Publishing Co. v. Butts, [388 U.S. 130 (1967)]."
Greenbelt Coop. Publ'g Ass'n, 398 U.S. 10-11.
Addressing whether the New York Times Co. v. Sullivan, 376 U.S. 254
(1964), actual-malice standard applies to a state-law claim for intentional infliction of emotional distress allegedly inflicted by an allegedly "outrageous" "ad parody" published in a magazine, the United States Supreme Court stated:
 "Respondent would have us find that a State's interest in protecting public figures from emotional distress is sufficient to deny First Amendment protection to speech that is patently offensive and is intended to inflict emotional injury, even when that speech could not reasonably have been interpreted as stating actual facts about the public figure involved. This we decline to do.
 "At the heart of the First Amendment is the recognition of the fundamental importance of the free flow of ideas and opinions on matters of public interest and concern. '[T]he freedom to speak one's mind is not only an aspect of individual liberty — and thus a good unto itself — but also is essential to the common quest for truth and the vitality of society as a whole.' Bose Corp. v. Consumers Union of United States, Inc., 466 U.S. 485, 503-504 (1984). We have therefore been particularly vigilant to ensure that individual expressions of ideas remain free from governmentally imposed sanctions. . . .
 "The sort of robust political debate encouraged by the First Amendment is bound to produce speech that is critical of those who hold public office or those public figures who are `intimately involved in the resolution of important public questions or, by reason of their fame, shape events in areas of concern to society at large.' Associated Press v. Walker, decided with Curtis Publishing Co. v. Butts, 388 U.S. 130, 164 (1967) (Warren, C.J., concurring in result). Justice Frankfurter put it succinctly in Baumgartner v. United States, 322 U.S. 665, 673-674
(1944), when he said that '[o]ne of the prerogatives of American citizenship is the right to criticize public men and measures.' Such criticism, inevitably, *Page 1127 
will not always be reasoned or moderate; public figures as well as public officials will be subject to `vehement, caustic, and sometimes unpleasantly sharp attacks,' New York Times, supra, at 270. . . .
". . . .
 "Respondent argues, however, that a different standard should apply in this case because here the State seeks to prevent not reputational damage, but the severe emotional distress suffered by the person who is the subject of an offensive publication. Cf. Zacchini v. Scripps-Howard Broadcasting Co., 433 U.S. 562 (1977) (ruling that the `actual malice' standard does not apply to the tort of appropriation of a right of publicity). In respondent's view, and in the view of the Court of Appeals, so long as the utterance was intended to inflict emotional distress, was outrageous, and did in fact inflict serious emotional distress, it is of no constitutional import whether the statement was a fact or an opinion, or whether it was true or false. It is the intent to cause injury that is the gravamen of the tort, and the State's interest in preventing emotional harm simply outweighs whatever interest a speaker may have in speech of this type.
 "Generally speaking the law does not regard the intent to inflict emotional distress as one which should receive much solicitude, and it is quite understandable that most if not all jurisdictions have chosen to make it civilly culpable where the conduct in question is sufficiently `outrageous.' But in the world of debate about public affairs, many things done with motives that are less than admirable are protected by the First Amendment. In Garrison v. Louisiana, 379 U.S. 64 (1964), we held that even when a speaker or writer is motivated by hatred or ill will his expression was protected by the First Amendment:
 "`Debate on public issues will not be uninhibited if the speaker must run the risk that it will be proved in court that he spoke out of hatred; even if he did speak out of hatred, utterances honestly believed contribute to the free interchange of ideas and the ascertainment of truth.' Id., at 73.
 "Thus while such a bad motive may be deemed controlling for purposes of tort liability in other areas of the law, we think the First Amendment prohibits such a result in the area of public debate about public figures.
". . . .
 "Respondent contends, however, that the caricature in question here was so `outrageous' as to distinguish it from more traditional political cartoons. There is no doubt that the caricature of respondent and his mother published in Hustler is at best a distant cousin of the political cartoons described above, and a rather poor relation at that. If it were possible by laying down a principled standard to separate the one from the other, public discourse would probably suffer little or no harm. But we doubt that there is any such standard, and we are quite sure that the pejorative description `outrageous' does not supply one. `Outrageousness' in the area of political and social discourse has an inherent subjectiveness about it which would allow a jury to impose liability on the basis of the jurors' tastes or views, or perhaps on the basis of their dislike of a particular expression. An `outrageousness' standard thus runs afoul of our longstanding refusal to allow damages to be awarded because the speech in question may have an adverse *Page 1128 emotional impact on the audience. See NAACP v. Claiborne Hardware Co., 458 U.S. 886, 910 (1982) (`Speech does not lose its protected character . . . simply because it may embarrass others or coerce them into action'). And, as we stated in FCC v. Pacifica Foundation, 438 U.S. 726 (1978):
 "`[T]he fact that society may find speech offensive is not a sufficient reason for suppressing it. Indeed, if it is the speaker's opinion that gives offense, that consequence is a reason for according it constitutional protection. For it is a central tenet of the First Amendment that the government must remain neutral in the marketplace of ideas.' Id., at 745-746.
". . . .
 "Here it is clear that respondent Falwell is a `public figure' for purposes of First Amendment law. The jury found against respondent on his libel claim when it decided that the Hustler ad parody could not `reasonably be understood as describing actual facts about [respondent] or actual events in which [he] participated.' App. to Pet. for Cert. C1. The Court of Appeals interpreted the jury's finding to be that the ad parody `was not reasonably believable,' 797 F.2d, at 1278, and in accordance with our custom we accept this finding. Respondent is thus relegated to his claim for damages awarded by the jury for the intentional infliction of emotional distress by `outrageous' conduct. But for reasons heretofore stated this claim cannot, consistently with the First Amendment, form a basis for the award of damages when the conduct in question is the publication of a caricature such as the ad parody involved here."
Falwell, 485 U.S. 50-57 (footnote omitted; emphasis added).
"Whether a communication is reasonably capable of a defamatory meaning is, in the first instance, a question of law." Camp v. Yeager,601 So.2d 924, 926 (Ala. 1992). "[I]f the communication is not reasonably capable of a defamatory meaning, there is no issue of fact, and summary judgment is proper." Harris, 466 So.2d at 964-65. "However, if the trial court finds that the statement is reasonably capable of a defamatory meaning, `it is then for the jury to say whether [the statement was] in fact so understood.'" Yeager, 601 So.2d at 927 (quoting W. Page Keeton et al., Prosser and Keeton on Torts § 111, at 781 (5th ed. 1984)). "[T]he test to be applied [by the court] in determining the defamatory nature of an imputation is that meaning which `would be ascribed to the language by a reader of listener of ordinary or average intelligence, or by a "common mind."'" Loveless, 295 Ala. at 148, 325 So.2d at 142. Similarly, "`[t]he question whether the evidence in the record in a defamation case is sufficient to support a finding of actual malice is a question of law.'" Milkovich, 497 U.S. at 17 (quoting Harte-HanksCommunications, Inc. v. Connaughton, 491 U.S. 657, 685 (1989)).
Summary judgment is appropriate only when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Rule 56(c)(3), Ala.R.Civ.P., and Dobbs v. ShelbyCounty Econ. Indus. Dev. Auth., 749 So.2d 425 (Ala. 1999). The court must accept the tendencies of the evidence most favorable to the nonmoving party and must resolve all reasonable doubts in favor of the nonmoving party. System Dynamics Int'l, Inc. v. Boykin, 683 So.2d 419
(Ala. 1996). "In a ruling on a *Page 1129 
summary-judgment motion in a defamation action involving a public figure, the trial judge must determine whether the plaintiff has shown by clear and convincing evidence that the defendant acted with actual malice." Sanders, 776 So.2d at 71. "`[I]n cases raising First Amendment issues . . . an appellate court has an obligation to "make an independent examination of the whole record" in order to make sure that "the judgment does not constitute a forbidden intrusion on the field of free expression."'" Milkovich, 497 U.S. at 17 (quoting Bose Corp.,466 U.S. at 499, quoting in turn New Times Co. v. Sullivan, 376 U.S. at 284-86).
In the context of Finebaum's December 15, 1998 sports talk radio program, Finebaum's statement — "It was Matt Coulter, and I can't remember the other clown, it, I mean, these two guys really slobbered over each other, I mean, I really thought they were going to start performing oral sex on one another, it was so sickening" — was not a statement that can "`reasonably [be] interpreted as stating actual facts' about [Coulter]." Milkovich, 497 U.S. at 20. Finebaum's statement is only rhetorical hyperbole, which the United States Supreme Court has held protected by the First Amendment. Moreover, Coulter did not present clear and convincing evidence that Finebaum intended to imply that Coulter is a homosexual. Saenz, supra. Finally, Coulter did not present clear and convincing evidence that Finebaum made the statement with actual malice. Accordingly, Finebaum and WERC are entitled to summary judgment on Coulter's defamation, tort of outrage, and invasion of privacy claims.
Therefore, the trial court erred in denying the summary judgment motion filed by Finebaum and WERC as it applied to these claims. We reverse the denial and remand this cause to the trial court for entry of a judgment consistent with this opinion.
REVERSED AND REMANDED WITH INSTRUCTIONS.
Moore, C.J., and Houston, See, Lyons, Brown, Harwood, Woodall, and Stuart, JJ., concur.